576 So.2d 1048 (1991)
STATE of Louisiana
v.
Leslie YOUNG.
No. KA 90 0332.
Court of Appeal of Louisiana, First Circuit.
March 5, 1991.
Rehearing Denied April 18, 1991.
*1051 Bryan Bush, Dist. Atty., Office of the Dist. Atty., Baton Rouge by Don Wall, Asst. Dist. Atty., for plaintiff/appellee.
Public Defender's Office, Baton Rouge, for defendant/appellant.
Before SAVOIE, CRAIN and FOIL, JJ.
CRAIN, Judge.
The defendant, Leslie Young, was charged by grand jury indictment with first degree murder, in violation of LSA-R.S. 14:30. He pled not guilty and, thereafter, changed his plea to not guilty and not guilty by reason of insanity. Subsequently, the State reduced the charge to second degree murder, a violation of LSA-R.S. 14:30.1. The defendant was rearraigned and entered a plea of not guilty. After a jury trial, the defendant was found guilty as charged. He received a sentence of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The defendant has appealed, alleging fourteen assignments of error.
Assignments of error numbers five, six, and seven were not briefed on appeal and, therefore, are considered abandoned. Uniform RulesCourts of Appeal, Rule 2-12.4.

FACTS
At approximately 11:00 p.m. on January 22, 1987, the victim, Donalyn Robillard, and her sister, Tonilyn, were leaving the Bengal Lounge on Highland Road in Baton Rouge, Louisiana. They asked two friends, Dean Guillot and William Phillips, to drive them to their car. Guillot and Phillips agreed. The four of them walked to Guillot's car, a small Fiat convertible, which was parked in the one hundred block of Taylor Street. Guillot sat behind the steering wheel; Phillips sat in a cramped position in the back; and Tonilyn sat in the front passenger seat. As the victim was about to get in the car on the front passenger side, a young, black male walked up, grabbed her, and pulled her a few feet away from the car. Although there is some confusion as to whether he ordered them to give him money or wallets, there was no doubt that he intended to rob them, as he was holding a steak knife to the victim's side. The victim might have given the perpetrator $20.00, but this fact was never positively established. Because the *1052 three occupants of the car were in a state of disbelief and were slow to react, the perpetrator stabbed the victim once in the left side. Upon grasping the seriousness of the situation, Tonilyn threw the defendant $4.00 and some change, which was all of the money she had with her. Phillips did not have his wallet. Guillot was unable to retrieve his wallet and give it to the perpetrator before he stabbed the victim in the side a second time. After stabbing the victim a second time, the perpetrator fled on foot. The Bengal security guard, Jimmy Foreman, witnessed the incident and was running to the car; but he was unable to prevent the robbery and stabbing. The victim was taken across the street to the police substation. Paramedics were called; and the victim was taken to a local hospital, where she died shortly after arrival.
In the subsequent investigation of this offense, suspicion was initially focused on Mark Anthony Richardson. Detectives who questioned residents in the area of the crime came across a woman who seemed to be afraid to cooperate and refused to give her name. However, this unknown woman explained that the perpetrator was the same person who had been arrested in the area a few weeks earlier for burglarizing cars. It is unclear whether the unknown woman witnessed the crime, saw the perpetrator fleeing after the crime, or merely saw a suspicious person in the area before the crime. Jimmy Foreman also informed detectives that he had seen the perpetrator in the area on previous occasions. This information led the police to search their computer for persons recently arrested for burglary in that area. This search led them to Mark Anthony Richardson. He was arrested on January 24, 1987, and was subsequently identified in a lineup by Foreman and Guillot.
However, at approximately 10:00 p.m. on January 30, 1987, the defendant walked into a police station in San Francisco, California, and confessed to Officer Michael Norman that he was wanted for a murder in Baton Rouge. In an attempt to verify this information, Norman contacted the Baton Rouge police and learned that, although the defendant was not wanted for the instant offense to which he was confessing, there was a warrant for the defendant's arrest on an attempted murder charge. The defendant was taken into custody. The next day, the defendant made a detailed, tape-recorded confession to the instant offense to two San Francisco police detectives. He also confessed to the attempted murder of a fellow employee, James Abbott, which took place on the morning of January 23, 1987. Subsequently, the defendant was returned to Baton Rouge. On February 6, 1987, he made a videotaped confession to the instant offense. On February 9, 1987, he made a tape-recorded confession to the instant offense. Although none of the four eyewitnesses to the crime were able to identify the defendant from a lineup, the police decided to release Richardson from jail due to the strength of the evidence against the defendant. At the time, Foreman expressed a feeling that the police were letting the wrong man go free.
At the trial, the following facts were established through the introduction into evidence of the defendant's confessions and the testimony of numerous state witnesses. The defendant was employed as a janitor/maintenance worker at the Department of Natural Resources building in Baton Rouge. On the afternoon of January 22, 1987, he received and cashed his paycheck of approximately $200.00. He apparently used all of this money to buy cocaine. From approximately 5:00 p.m. to 9:00 p.m. that evening, the defendant, Tyrone Clark, and Carey Adams were injecting cocaine at Carey Adams' house. When the defendant ran out of cocaine and money, he asked his mother, Creasie Young, and a sister, Barbara Williams, for more money to buy cocaine, but they refused. The defendant then decided to commit a robbery in order to buy more cocaine.
After committing the instant offense, the defendant purchased more cocaine with a friend, Phillip Jarmon. The next morning, the defendant went to work while still under the influence of cocaine. He became engaged in an argument with a co-worker, James Abbott; and he stabbed Abbott several *1053 times with a screwdriver. The defendant then left work and went home.
During several family meetings, the defendant either confessed that he had committed the instant murder or stated that someone said he had killed somebody. The defendant almost surrendered to the police. His father, Etil Young, drove the defendant to the police station, but the defendant changed his mind at the last minute and decided he wanted some cigarettes. After buying some cigarettes, the defendant decided not to surrender.
At one of these family meetings, the defendant expressed a desire to see his sister, Cassandra Young, who lived in San Francisco. Two sisters, Margie Smith and Barbara Williams, contributed approximately $300, with which the defendant bought a plane ticket to San Francisco. Early Saturday morning, January 24, the defendant took a cab to the airport and flew to San Francisco. While the defendant was staying with his sister, Cassandra, in San Francisco, another sister, Velma Murray, telephoned the defendant when she heard that Richardson had been arrested, and she advised the defendant to surrender. In the meantime, Geraldine Dickerson, the defendant's first cousin, had approached the authorities and implicated the defendant in the instant offense. As noted above, on January 30, 1987, the defendant turned himself in to the San Francisco police.

ASSIGNMENTS OF ERROR NUMBERS ONE AND TWO:
In these assignments of error, the defendant contends that his oral, tape-recorded, and video-taped confessions in San Francisco and Baton Rouge should have been suppressed because they were not freely and voluntarily given. However, he does not allege police misconduct, coercion, or Miranda rights violations. Instead, he contends that his confessions were involuntary because of his diminished mental abilities.
The State has the burden to prove that the defendant's mental defect did not preclude him from giving a voluntary and free confession with a knowledgeable and intelligent waiver of his rights. State v. Istre, 407 So.2d 1183, 1186 (La.1981). With regard to the relationship between diminished mental or intellectual capacity and involuntariness, the Louisiana Supreme Court has noted that such a condition does not of itself vitiate the ability to knowingly and intelligently waive constitutional rights and make a free and voluntary confession. State v. Benoit, 440 So.2d 129, 131 (La. 1983). The critical factors are whether or not the defendant was able to understand the rights explained to him and whether or not he voluntarily gave a statement. State v. Wascom, 524 So.2d 1342, 1345 (La.App. 1st Cir.), writ denied, 531 So.2d 470 (La. 1988); State v. Dickinson, 492 So.2d 173, 177 (La.App. 1st Cir.), writ denied, 498 So.2d 14 (La.1986).
No expert medical testimony was offered at the motion to suppress hearings. In making his argument, the defendant relies on the trial testimony of Dr. Mark Zimmerman, a psychologist who testified as an expert witness for the defense. Dr. Zimmerman testified that the defendant has an I.Q. of 67 and is mildly retarded. The defendant received a poor education, has possible brain damage, and has a possible personality disorder. He found evidence that the defendant is a paranoid schizophrenic. Dr. Zimmerman concluded that, because of delusions of grandiosity and/or persecution, the defendant might confess to a crime he did not commit. However, the State's medical experts, Drs. Don Hoppe and Francisco Silva, found no evidence that the defendant is schizophrenic. Additionally, the reports of the Sanity Commission members (Drs. Hypolite Landry and Francisco Silva), which were introduced into evidence at a pretrial hearing, concluded that the defendant was competent to stand trial and able to assist in his defense.
After considering all of the evidence in the record bearing upon the defendant's mental abilities and the testimony of the police officers to whom the defendant confessed, and after reviewing the defendant's confessions, we find that the State proved that the defendant had the mental capacity to, and did in fact, knowingly and intelligently *1054 waive his constitutional rights before making his confessions and that these confessions were made freely and voluntarily. Therefore, the trial court properly allowed the audiotapes, videotape, and testimony on the defendant's confessions to be admitted into evidence.[1]
The defendant also contends that his confessions were suspect in light of conflicting facts contained in the different confessions, information in the confessions which did not agree with the facts of the offense, and the fact that Mark Anthony Richardson was actually identified as the perpetrator. However, these points were not relevant to a motion to suppress as they related to the weight to be given the defendant's confessions, not their admissibility.
For the above reasons, these assignments of error are meritless.

ASSIGNMENT OF ERROR NO. THREE:
In this assignment of error, the defendant contends that the trial court erred in failing to order the disclosure to the defense of taped and written statements by the eyewitnesses to the offense.
Upon request, the prosecution must disclose any evidence favorable to the defendant, if such evidence is material to the issue of guilt or punishment. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 1196-1197, 10 L.Ed.2d 215 (1963). Upon receiving a specific and relevant request for such material, the prosecution must either disclose it to the defense or allow the trial court to make an in camera inspection of the material. State v. Cobb, 419 So.2d 1237, 1241 (La.1982). However, there is no constitutional requirement that the prosecution make a complete accounting to the defense of all police investigatory work on a case. United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976).
Shortly after the murder, the four eyewitnesses made handwritten statements to the police, followed by tape-recorded statements. At trial, the defense requested that the trial court review the taped and written statements in camera for Brady material. The trial court agreed. Subsequently, the trial court ruled that these statements contained no Brady material. However, the trial court did not order these statements sealed and included in the appellate record, although it is arguable that the defendant made such a request. We ordered the trial court to supplement the instant appeal record by locating these statements, ordering them sealed, and forwarding them to this Court. We have reviewed these written and taped statements (as well as the corresponding transcripts of the taped statements)[2] and find that the trial court's ruling was correct.
In his brief to this Court, the defendant states: "The selective use of certain portions of Mr. Foreman's prior testimony indicates that there was other information in those statements which was helpful to the defendant." In reviewing these taped and written statements, we did find one item of exculpatory evidence contained in the taped statement of Jimmy Foreman, wherein he indicated that he "tentatively" identified a picture of Calvin Henry from a police mugshot book. This initial identification of Calvin Henry was revealed at trial through the testimony of Detective Keith Bauer and Jimmy Foreman. While this information was exculpatory in the sense that Foreman identified someone other than the defendant, it also acted to damage the main defense theory of the case, i.e., that Mark Anthony Richardson committed the instant offense. If Foreman incorrectly identified Calvin Henry, it was *1055 highly possible that he also misidentified Richardson. Apart from this one item of Brady material (the omission of which could not have prejudiced the defendant for the reasons demonstrated above), our review of all of the taped and written statements indicates that the trial court's ruling was correct. See La.C.Cr.P. art. 921.
This assignment of error is meritless.

ASSIGNMENT OF ERROR NO. FOUR:
In this assignment of error, the defendant contends that the trial court erred in allowing State Exhibit 14A to be admitted into evidence without excising an irrelevant, hearsay statement by Mark Richardson appearing thereon.
State Exhibit 14A was the printed waiver of line-up rights form used when Jimmy Foreman identified Richardson at a line-up held on January 24, 1987. At the top of this line-up form, Richardson had written: "I want this lines (sic) up. Mark Richardson." The defense had no objection to the introduction of the line-up form itself. However, the defense did object to this handwritten statement by Richardson, arguing that the statement was hearsay and that it was also irrelevant. The defense requested that the statement be excised from the line-up form before its admission into evidence. The State argued that the statement on the line-up form was relevant and that it was not hearsay because it was not offered to prove the truth of the statement; rather, it was offered merely to show that Richardson wanted to stand in a line-up. The trial court overruled the defendant's objection and allowed the line-up form to be admitted into evidence without excising Richardson's statement.
Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." La.Code of Evidence art. 401. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." La.Code of Evidence art. 801 C.
The identity of the perpetrator was the main issue in the instant case. Therefore, circumstances surrounding the identification and subsequent arrest of Richardson were relevant. Consequently, Richardson's written statement that he desired a lineup was relevant, albeit very indirectly, to the issue of identity. However, the statement was clearly hearsay and should not have been admitted into evidence. We reject the State's argument that this statement was not being offered for its truth. Clearly, the statement was offered to prove that Richardson did want a line-up. Nevertheless, for the reasons which follow, we find that the erroneous admission into evidence of this hearsay statement by Richardson was harmless beyond a reasonable doubt.
The defendant contends that the introduction of this hearsay statement had the prejudicial effect of asserting Richardson's claim of innocence. We disagree. While this hearsay statement indicated that Richardson wished to have the line-up, it did not explain why he wished to do so. As conceded by the defense in its brief to this Court, there are at least two different interpretations of the meaning of this statement. An innocent person accused of a crime might wish to have a line-up in order to exonerate himself. On the other hand, a guilty person who believed that he could not be identified might also wish to have a line-up in order to reduce his chances of being convicted. Therefore, we cannot conclude that this hearsay statement had the sole effect of asserting Richardson's claim of innocence.
The defense also contends that the introduction of this hearsay statement had the prejudicial effect of undermining Richardson's identification as the perpetrator. Again, we disagree. The jury was aware that none of the witnesses to this offense could identify the defendant. The jury also was aware that Richardson was identified and arrested for the instant murder and was the primary suspect until the defendant confessed in San Francisco and was extradicted. The defendant gave four separate confessions to the instant offense. Obviously, the jury rejected the defense *1056 theory that the defendant was innocent and confessed to this murder only because of his mental deficiencies and/or personality disorder(s). We find that the identification of Richardson was undermined by Guillot's testimony that he was not sure of his line-up identification of Richardson, Foreman's testimony that he actually observed the perpetrator's face for "[m]aybe a second at most," and the defendant's four confessions to this offense, rather than by the questionable meaning of Richardson's hearsay statement on State Exhibit 14-A.
Considering all of the above, we find that, beyond a reasonable doubt, this improperly admitted hearsay statement did not contribute to the verdict. See La.C. Cr.P. art. 921; State v. Banks, 439 So.2d 407, 409 (La.1983).
This assignment of error is meritless.

ASSIGNMENT OF ERROR NUMBER EIGHT:
In this assignment of error, the defendant contends that the trial court erred in allowing the prosecutor to ask leading questions during the direct examination of four State witnesses. These witnesses were the defendant's father, Etil Young, and the defendant's sisters, Velma Murray, Barbara Williams, and Margie Smith.
Louisiana Code of Evidence article 611C provides, in pertinent part:
Generally, leading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony and in examining an expert witness on his opinions and inferences. However, when a party calls a hostile witness, a witness who is unable or unwilling to respond to proper questioning, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions.
The use of leading questions is largely within the discretion of the trial court; and only a clear abuse of that discretion which prejudices the defendant's rights will justify the reversal of a conviction. State v. Jones, 439 So.2d 598, 599-600 (La.App. 1st Cir.1983).
After the defendant committed the instant offense, several of his relatives, including Ms. Williams and Ms. Smith, helped him to go to San Francisco. There can be no doubt that these witnesses were hostile and/or identified with the defense. We do not accept the defendant's argument that these witnesses became identified with the State rather than the defense once they were offered immunity from prosecution (for aiding and abetting the defendant after the instant offense) in exchange for testifying before the grand jury and at trial. Therefore, the trial court correctly ruled that, pursuant to Louisiana Code of Evidence article 611C, the prosecution could use leading questions during the direct examination of these witnesses.
Even assuming, arguendo, that the trial court erred in allowing the prosecution to use leading questions under these circumstances, we find that the defendant has failed to allege sufficient prejudice to justify a reversal of his conviction. Although the defendant contends that the prosecution used leading questions throughout the examination of these witnesses and makes a general allegation of prejudice therefrom, in his brief to this Court he only refers to one line of questioning in which specific prejudice allegedly occurred, i.e., when the prosecutor questioned these witnesses about conversations with the defendant wherein the defendant confessed to them that he had committed the murder. However, Etil Young, Barbara Williams, and Margie Smith never testified that the defendant confessed to them. Etil Young and Barbara Williams explained that the defendant stated only that "somebody said I killed somebody" or "they say that I stabbed a girl and that she died." Margie Smith testified that the defendant did not confess to her. Only Velma Murray testified that the defendant confessed to her that he committed the murder, and this evidence was established by the prosecutor without the use of a leading question.
For the above reasons, this assignment of error is meritless.

*1057 ASSIGNMENTS OF ERROR NOS. NINE AND THIRTEEN:
In assignment of error number nine, the defendant contends that the trial court erred in denying his motions for a mistrial during the testimony of State witnesses Margie Smith and Barbara Williams. Specifically, he contends that the prosecutor improperly placed before the jury the grand jury testimony of these witnesses through the use of leading questions and grand jury transcripts. He also contends that, through improper attempts at impeachment of these witnesses, the prosecutor interjected himself as a witness in the case. In assignment of error number thirteen, the defendant contends that the trial court erred in refusing to order the State to disclose to the defense evidence presented at the grand jury. Specifically, the defendant contends that the grand jury testimony contained Brady material.
During the direct examination of these witnesses, the prosecutor tried to establish whether or not the defendant had confessed to the murder in the presence of these witnesses and, if so, what details of the crime he had related to them. Each witness denied such a confession, whereupon the prosecutor asked whether or not they had ever told him something different. The same exchange occurred when the prosecutor tried to establish various details of the offense allegedly related to these witnesses by the defendant. When these witnesses denied that the defendant had given such details of the offense, the prosecutor asked whether or not they had ever told him something different.
The prosecutor's questioning of these two witnesses and his attempts to impeach them on the basis that their trial testimony conflicted with previous responses they had made was derived from transcripts of grand jury testimony by these witnesses which the State had in its possession. Upon seeing the prosecutor refer to transcripts during questioning, defense counsel guessed (correctly) that the prosecutor was using grand jury transcripts and he moved for a mistrial. The prosecutor explained that he had spoken individually with these witnesses before their grand jury testimony and that his questions during direct examination were based on these conversations, not the grand jury testimony of these witnesses. However, the prosecutor also stated that the answers given by these witnesses during these private conversations were basically the same as those responses given during their grand jury testimony. The prosecutor also admitted that he was using grand jury transcripts to question these witnesses, although he explained that he had taken care to ask questions in such a way that he did not quote from the grand jury transcripts.
Defense counsel requested a mistrial on several grounds. He complained that the prosecutor had improperly interjected grand jury testimony into the trial. He also complained that the prosecutor's method of questioning these witnesses had actually made the prosecutor a witness in the case. On this basis, combined with his motion for a mistrial, defense counsel also requested the trial court to "disqualify" the prosecutor. When the trial court refused to disqualify the prosecutor and denied these motions for a mistrial, defense counsel requested that the trial court conduct an in camera review of the grand jury testimony of these witnesses for Brady material. The trial court agreed to do so. Shortly thereafter, defense counsel also requested the trial court to review the grand jury transcripts and compare them with the prosecutor's questions to these two witnesses at the trial. The trial court agreed to do so and stated that the grand jury transcripts would be sealed and included in the appellate record. Thereafter, the trial court reviewed the grand jury transcripts and found no Brady material contained therein.
Initially, we note that the use of leading questions by the prosecutor was previously addressed in assignment of error number eight. Next, we note that on only one occasion during the testimony of these two witnesses did the defense object that the prosecutor was not laying the proper foundation to impeach these witnesses. When this objection was made, the trial court sustained it. Thereafter, the prosecutor *1058 asked Ms. Williams if she remembered talking with him before testifying at the grand jury hearing, and she replied that she did not.
Our review of these sealed grand jury transcripts indicates that these two witnesses were clearly giving testimony at the trial which contradicted their grand jury testimony (and, presumably, contradicted the information related to the prosecutor during their conversations which took place before the grand jury hearing). Yet, comparing the grand jury transcripts to the trial transcript, we find, as the trial court did, that the prosecutor did not improperly interject grand jury testimony into the instant trial. On the other hand, we do not condone the prosecutor's methods of attempting to impeach these two witnesses. Grand jury testimony was clearly inadmissible at trial; and the disagreements between the prosecutor and these witnesses as to what was said in their private discussions before the grand jury hearing only would have led to a swearing match between the prosecutor and these witnesses.
In any event, the improper impeachment and/or questioning of a witness will not require reversal of a conviction absent a clear showing that the matters complained of are of such an extremely prejudicial nature that the defendant was deprived of a fair and impartial trial. See La.C.Cr.P. art. 921; State v. Burge, 486 So.2d 855, 865 (La.App. 1st Cir.), writ denied, 493 So.2d 1204 (La.1986); State v. Price, 476 So.2d 989, 993 (La.App. 1st Cir. 1985). Furthermore, mistrial is a drastic remedy; and, except in instances in which a mistrial is mandatory, it is warranted only when a trial error results in substantial prejudice to the defendant depriving him of a reasonable expectation of a fair trial. State v. Starks, 471 So.2d 1029, 1033 (La. App. 1st Cir.1985). In ruling on a motion for mistrial, the trial court has the sound discretion to determine whether or not the activity or comment is so prejudicial to the defendant that he could not receive a fair trial. State v. Spooner, 550 So.2d 1289, 1296-1297 (La.App. 1st Cir.1989), writ denied, 566 So.2d 394 (La.1990).
The most important aspect of Ms. Smith's testimony was that she did not recall that the defendant confessed to this offense. Ms. Williams testified that she did not recall the defendant confessing to this offense or supplying any details thereof, nor did she remember discussing the case with the prosecutor before the grand jury hearing. Accordingly, even if we were to find significant error in the manner in which the prosecutor conducted the examination of these two witnesses, after considering all of their trial testimony, we find no actual prejudice to the defendant. Therefore, we conclude that the trial court correctly denied the defendant's motions for a mistrial and his motion to disqualify the prosecutor.
Finally, we have reviewed all of the sealed grand jury transcripts which were previously reviewed by the trial court in camera for Brady material and find that the trial court correctly ruled that no exculpatory evidence was contained therein.
For the above reasons, these assignments of error are meritless.

ASSIGNMENTS OF ERROR NOS. TEN AND ELEVEN:
In these assignments of error, the defendant contends that the trial court erred in denying his motions for a mistrial which were made during the direct examination of Margie Smith. The defendant contends that the State was improperly allowed to call Ms. Smith as a witness, impeach her, warn her of the penalty for perjury and, by doing so, intimidate her into invoking her Fifth Amendment privilege against self-incrimination. He contends that this "tactic" by the prosecution deprived him of his opportunity to confront and cross-examine Ms. Smith.
When the jury was removed and Ms. Smith was warned of the penalty for perjury, the trial court appointed an attorney from the Public Defender's Office to discuss this issue with her. When Ms. Smith was recalled to the stand, her court-appointed attorney indicated that he would advise her to invoke the Fifth Amendment *1059 and refuse to answer any questions by the prosecution on the subject of her conversations with the defendant after the offense. He also indicated that Ms. Smith would refuse to answer any such questions on cross-examination. Arguing that the prosecution had intimidated the witness into invoking the Fifth Amendment, the defendant requested a mistrial on the basis that he would be denied the right to confront and cross-examine her. At this point, to enable the defendant to cross-examine this witness, the prosecution agreed to an offer of immunity from prosecution if Ms. Smith would submit to cross-examination. However, the defendant again requested a mistrial, arguing that this grant of immunity removed the penalty of perjury and, therefore, "foreclosed the possibility of truthful testimony from this witness." The trial court rejected this argument and, in denying these motions for a mistrial, stated to defense counsel: "[Y]ou can't have your cake and eat it too." The trial court also observed that the defense was trying to create a situation for a mistrial.
We agree with these observations by the trial court and conclude that the defense was not entitled to a mistrial under these circumstances. If the prosecution was guilty of using the threat of a perjury conviction as a tactic to force Ms. Smith to invoke the Fifth Amendment, which in turn would prevent the defendant from cross-examining her, then why did the State agree to offer her immunity from prosecution in exchange for her cross-examination testimony? Although the prosecution did not properly comply with La.C.Cr.P. art. 439.1 in offering this grant of immunity to Ms. Smith, it is obvious that the State was trying to ensure that the defendant would have the opportunity to cross-examine this witness.
Furthermore, we reject the defendant's argument that this offer of immunity from prosecution in exchange for Ms. Smith's cross-examination "foreclosed the possibility of truthful testimony from this witness." Ms. Smith was the defendant's sister. Apart from mere speculation, the defendant has not established any reason why Ms. Smith would not give truthful testimony on cross-examination.
Finally, we also agree with the trial court's observation that the defense was trying to create a mistrial situation. As evidence of this fact, we note that, although the defense objected when the prosecution offered immunity to Ms. Smith in exchange for her cross-examination testimony, upon hearing the defendant's objection to the offer of immunity, the prosecution then suggested that it would withdraw the offer; but defense counsel made no response. The defense chose not to cross-examine Ms. Smith (or Ms. Williams). This decision to forego cross-examination was a strategic decision, rather than a foregone conclusion, resulting from allegedly improper prosecutorial tactics. Accordingly, we find that the trial court correctly denied these motions for a mistrial.
These assignments of error are meritless.

ASSIGNMENT OF ERROR NO. TWELVE:
In this assignment of error, the defendant contends that the trial court erred in denying his motion for a mistrial, which was requested on the basis of prosecutorial misconduct during the direct examination of Margie Smith.
After conferring with court-appointed counsel, Ms. Smith was recalled to the stand to continue direct examination, whereupon she invoked her Fifth Amendment privilege against self-incrimination. At a bench conference which was not made a part of the instant record, the prosecutor apparently agreed to refrain from asking any further questions dealing with what the defendant told Ms. Smith. This agreement was apparently made in order to keep Ms. Smith from again invoking her Fifth Amendment privilege. Thereafter, direct examination continued. However, when the prosecutor asked Ms. Smith about the subject of a conversation with the defendant which occurred at Carey Adams' house, defense counsel objected. The jury was removed. Defense counsel noted a violation of the earlier bench conference agreement and requested a mistrial on the *1060 basis of prosecutorial misconduct. The prosecutor explained that he believed the earlier bench conference agreement to prohibit only questions about conversations between the defendant and Ms. Smith which occurred at their mother's house. He stated that the line of questioning objected to by defense counsel revealed that Ms. Smith also conversed with the defendant at Carey Adams' house and that he should be allowed to further explore this new information. The prosecutor also added: "I will never agree not to question this witness about something that I have never heard of before." After admonishing the prosecutor that, in light of their prior bench conference agreement he should have approached the bench before exploring this new subject matter, the trial court concluded that the prosecutor could continue this line of questioning and denied the defendant's motion for a mistrial. Thereafter, the prosecutor resumed the direct examination of Ms. Smith without pursuing this new line of questioning on conversations with the defendant at Carey Adams' house.
In his brief to this Court, the defendant states: "Although the prosecution did not thereafter continue questioning this witness about what [the defendant] may have said to her during this particular conversation, the damage was done." The defendant does not explain how or why he was prejudiced by the prosecutor's conduct, apart from reurging the other alleged errors which occurred during the questioning of Ms. Smith and Ms. Williams. These alleged errors have been addressed in previous assignments of error and found to be meritless. We find that the trial court correctly denied this motion for a mistrial based on prosecutorial misconduct.
This assignment of error is meritless.

ASSIGNMENT OF ERROR NO. FOURTEEN:
In this assignment of error, the defendant contends that the evidence was insufficient to support the instant conviction. Initially, we note that, in order to challenge a conviction on the basis of insufficiency of the evidence, the defendant should have proceeded by way of a motion for post-verdict judgment of acquittal. See La.C.Cr.P. art. 821. Nevertheless, we will consider a claim of insufficiency of the evidence which has been briefed pursuant to a formal assignment of error. See State v. Tate, 506 So.2d 546, 551 (La.App. 1st Cir.), writ denied, 511 So.2d 1152 (La.1987).
The standard of review for the sufficiency of the evidence to uphold a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude that the State proved the essential elements of the crime and the defendant's identity as the perpetrator of that crime beyond a reasonable doubt. See La.C.Cr.P. art. 821; State v. Johnson, 461 So.2d 673, 674 (La. App. 1st Cir.1984). The Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), standard of review incorporated in Article 821 is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, LSA-R.S. 15:438 provides that the factfinder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. State v. McLean, 525 So.2d 1251, 1255 (La.App. 1st Cir.), writ denied, 532 So.2d 130 (La.1988).
At the time of this offense, LSA-R.S. 14:30.1 provided, in pertinent part:
Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, aggravated arson, aggravated burglary, aggravated kidnapping, aggravated escape, armed robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm.
In his brief to this Court the defendant contends that, apart from his confessions to the instant offense, the State's evidence was "wholly circumstantial." Again he notes that Mark Richardson was the initial suspect in the investigation. He asserts that the sufficiency of the evidence hinged *1061 upon the reliability of his confessions. After identifying inconsistent facts and details among the four confessions and conflicts between the confessions and the trial testimony, the defendant concludes that these confessions are unreliable. Finally, he puts forth a hypothesis which allegedly explains all of the evidence. The defendant contends that someone else committed this offense, and he explains that he confessed only because he was told by others that he committed this murder.
The defendant is correct in asserting that, apart from his confessions, the remaining evidence is circumstantial. Furthermore, the physical evidence in this case was neutral. Fingerprints taken from the passenger side of Guillot's car did not match the defendant or Richardson. While a steak knife was found a short distance from the crime scene, subsequent analysis revealed no fingerprints or blood stains on this knife. We even agree with the defendant's observation that, "[t]he evidence presented to the jury was lengthy and confusing." Nevertheless, we are unwilling to dismiss the defendant's confessions as unreliable. We find that the inconsistencies among the confessions themselves, and the conflict between the confessions and the actual facts of the offense, are not so great in number or severity and, therefore, do not undermine the voluntariness and trustworthiness of these confessions. Instead, as the State notes in its brief to this Court, such inconsistencies and conflicts are more readily explained by the fact that the defendant was under the influence of cocaine when he committed this offense. We also note that, in addition to the defendant's four separate confessions to law enforcement officers, his sister, Velma Murray, and his first cousin, Geraldine Dickerson, also testified that the defendant confessed to this murder at family meetings before he fled to San Francisco.
As the trier of fact, the jury was free to accept or reject, in whole or in part, the testimony of any witness. Furthermore, where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Richardson, 459 So.2d 31, 38 (La.App. 1st Cir.1984). Although the defendant did not testify at the trial, his videotaped and tape-recorded confessions were introduced into evidence, as well as the testimony of numerous witnesses. To the extent that conflicting testimony was involved herein, the instant guilty verdict indicates that the jury resolved such conflicts in favor of the State's witnesses. The guilty verdict also indicates that the jury found the defendant's confessions to be reliable and rejected the defense theory that the defendant confessed to a crime which he did not commit.
After a careful review of the record, we believe that a rational trier of fact, viewing all of the evidence as favorably to the prosecution as any rational factfinder can, could have concluded that the State proved beyond a reasonable doubt that the defendant was guilty of second degree murder. See State v. Mussall, 523 So.2d 1305 (La. 1988).
This assignment of error is meritless.

PATENT ERROR
We have noted several patent errors herein. On March 13, 1989, on its own motion, the trial court appointed a sanity commission. On May 3, 1989, without conducting a contradictory hearing, the trial court ruled that the defendant was competent to proceed to trial and was able to assist counsel.
La.C.Cr.P. art. 642 provides:
The defendant's mental incapacity to proceed may be raised at any time by the defense, the district attorney, or the court. When the question of the defendant's mental incapacity to proceed is raised, there shall be no further steps in the criminal prosecution, except the institution of prosecution, until the defendant is found to have the mental capacity to proceed.
La.C.Cr.P. art. 647 provides:
The issue of the defendant's mental capacity to proceed shall be determined *1062 by the court in a contradictory hearing. The report of the sanity commission is admissible in evidence at the hearing, and members of the sanity commission may be called as witnesses by the court, the defense, or the district attorney. Regardless of who calls them as witnesses, the members of the commission are subject to cross-examination by the defense, by the district attorney, and by the court. Other evidence pertaining to the defendant's mental capacity to proceed may be introduced at the hearing by the defense and by the district attorney.
The first patent error noted herein is that the trial court failed to conduct a contradictory hearing in ruling on the defendant's capacity to proceed. However, the defense did not object to this lack of a contradictory hearing or to any denial of the right to confront and cross-examine the two sanity commission doctors. The defense only objected to the trial court's finding that the defendant was competent to proceed. Accordingly, the absence of a contemporaneous objection by the defense precluded any challenge of the propriety of conducting the hearing. See La.C.Cr.P. art. 841; State v. Waymire, 504 So.2d 953, 962 (La.App. 1st Cir.1987).
Furthermore, while the trial court failed to conduct a contradictory hearing, it did introduce into evidence the reports of the two sanity commission doctors which concluded that the defendant was competent to proceed to trial and could assist counsel. We have examined the entire record herein, including these two reports, and conclude that the trial court correctly found the defendant competent to proceed to trial. Accordingly, the lack of a contradictory hearing, while patent error, was harmless. See State v. Narcisse, 426 So.2d 118, 129 (La.), cert. denied, 464 U.S. 865, 104 S.Ct. 202, 78 L.Ed.2d 176 (1983).
We also note that further proceedings in the prosecution were conducted in the interim between the appointment of the sanity commission (March 13) and the ruling that the defendant had the capacity to proceed to trial (May 3). See La.C.Cr.P. art. 642. On April 4, 1989, the motion to suppress hearing was resumed and one defense witness testified. Thereafter, the motion to suppress was again continued. On the same date, the State amended the indictment from first degree murder to second degree murder, and the trial court fixed bond. On May 3, before ruling on the defendant's capacity to proceed to trial, the trial court issued a ruling denying the defendant's motion to suppress and allowed the defendant to be rearraigned on the amended charge of second degree murder.
While Article 642 permits the institution of prosecution in the interim between the appointment of a sanity commission and the ruling thereon, no provision is made for the amendment of an indictment or bill of information. In any event, assuming it was patent error to allow the filing of an amended charge, we find such error is not reversible. The reduction of the charge to second degree murder clearly benefitted the defendant by eliminating the possibility of a death sentence upon conviction. Likewise, if patent error occurred when the trial court fixed bond, the fixing of a bond on a reduced charge is also favorable to the defendant and cannot be deemed reversible patent error.
The motion to suppress hearings were held on four different dates, and the ruling thereon was issued on May 3. Although it was patent error to resume the motion to suppress hearing on April 4, we note that only one witness, a defense witness, testified on this date. We find no reversible error. Furthermore, while the trial court issued a ruling denying the motion to suppress on May 3, the same date as the ruling on the defendant's capacity to proceed, the motion to suppress ruling came immediately before the capacity to proceed ruling and, therefore, technically was patent error. However, since the rulings on the motion to suppress and the defendant's capacity to proceed were issued in the same hearing, we find no reversible error.
Finally, the trial court permitted the defendant to be rearraigned on the charge of second degree murder on May 3, *1063 but it did so immediately before the ruling on the defendant's capacity to proceed. Again, although we find patent error in the rearraignment, we find no reversible error. The defendant entered a plea of not guilty and did not object to the rearraignment occurring before the capacity to proceed ruling. See La.C.Cr.P. art. 841; State v. Beauchamp, 510 So.2d 22, 29 (La.App. 1st Cir.), writ denied, 512 So.2d 1176 (La. 1987).[3]
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] In determining whether or not a ruling on a motion to suppress was correct, this Court is not limited to the evidence adduced at the hearing on that motion. Instead, we will consider the record as a whole, including trial testimony. State v. Istre, 407 So.2d at 1184; State v. Fleming, 457 So.2d 1232, 1235 n. 3 (La.App. 1st Cir.), writ denied, 462 So.2d 191 (La.1984).
[2] The transcript of William Phillips' tape-recorded statement indicates that it lasted approximately ten minutes. However, the cassette tape of this statement is missing approximately eight minutes. Nevertheless, our review of the transcript of this statement indicates that no Brady material was contained therein.
[3] The trial court apparently believed that the appointment of a sanity commission was necessitated by the defendant's plea of not guilty and not guilty by reason of insanity. This belief was incorrect. The fact that the defendant's capacity to proceed is called into question does not, for that reason alone, require the trial court to order a mental examination of the defendant. The trial court must also have reasonable grounds to doubt the defendant's capacity. La. C.Cr.P. art. 643. The ordering of a sanity commission to inquire into the defendant's present capacity to proceed rests in the sound discretion of the trial court. State v. Beauchamp, 510 So.2d at 29.

Apparently, the trial court also believed that, once the defendant was rearraigned on the amended charge of second degree murder and pled not guilty, the issue of a ruling on the defendant's capacity to proceed became moot since the dual plea of not guilty and not guilty by reason of insanity was withdrawn. This belief was also incorrect. Once a sanity commission was appointed, no further steps in the prosecution should have been taken until the trial court found that the defendant had the capacity to proceed to trial. La.C.Cr.P. art. 642. In any event, at the May 3 hearing, after initially finding the capacity to proceed issue moot, the trial court subsequently ordered the two reports by the sanity commission doctors to be introduced into evidence and ruled that the defendant had the capacity to proceed to trial.