JOHNSON, J.,
 

 would grant and assigns reasons.
 

 |, John D. Floyd (Floyd) was indicted for two counts of second degree murder, the first count for the murder of William Hines, Jr., and the second count, for the murder of Rodney Robinson.
 
 State v. Floyd,
 
 435 So.2d 992, 993-94 (La.1983). He was ultimately tried by a judge alone, found not guilty of the murder of Robinson and convicted for the second degree murder of Hines. Despite confessing to both crimes, the evidence conclusively proved that Robinson’s assailant was not Floyd, a Caucasian with Type B blood, but instead, a black male with Type A blood.
 
 Id.
 
 at 994.
 

 FACTS
 

 On November 26, 1980, William Hines, Jr. was discovered lying beside his bed in his apartment, dead from multiple stab wounds. Three days later, on November 29, 1980, Rodney Robinson was discovered in the hallway of a New Orleans hotel, stabbed to death. Both victims were homosexual men, murdered in the early morning hours, in their bedrooms. Pubic hairs of Negroid origin, not belonging to either of the victims, and not belonging to Floyd, were found at both crime scenes. Two half-filled glasses of whiskey were found at both murder scenes. Because of the similarities, investigating police officers theorized that the two homicides were linked and that 12one individual committed both crimes.
 

 The pubic hair evidence in the Robinson murder was left by the perpetrator in a blood-stained plastic cap. Pubic hair was also found on a napkin containing semen
 
 *58
 
 next to Robinson’s body. A black male was seen fleeing the scene of the Robinson murder immediately after the murder. Floyd was ultimately excluded by forensic hair comparison as the donor of the biological evidence found at the Robinson crime scene.
 

 Hines’ apartment revealed no signs of a struggle, no evidence of burglary, and no evidence that the apartment had been entered by force. Hines’ clothes were found neatly draped over a chair. His body was discovered approximately thirty-six hours after his death, and scientific examination of the body revealed no clues. Pubic hair, from an black male was found at the Hines’ crime scene. Both the victim and defendant were excluded as donors of the pubic hair by forensic hair comparison. Additionally, the coroner believed that Hines’ killer may have had medical knowledge.
 

 The police learned that a man called “Crazy Johnny” had made statements which linked him to the killings. Two French Quarter residents who also knew “Crazy Johnny” identified him as John D. Floyd and selected his photograph from a picture lineup presented by the New Orleans police. One of those persons, Stephen Edwards, who identified the defendant as “Crazy Johnny,” operated a French Quarter bar. Edwards related to police an encounter with Floyd on the sidewalk near Edwards’ establishment. Edwards had warned Floyd not to enter his bar because Floyd had been banned from the bar for recent disruptive behavior. According to Edwards, Floyd then told him to leave him alone, and suggested that “I already wasted one person.” Edwards then asked if the victim had been the man who lived Raround the corner (Hines) and Floyd answered, “Yeah. On Governor Nicholls.”
 

 Another witness, Gerald Griffin, had accompanied Floyd to the detoxification unit in New Orleans Charity Hospital on the morning of November 29, 1980. Griffin stated that Floyd had asked him if he knew about the hotel killing (which had just occurred on November 29), and Floyd then stated that people who were hospitalized as mentally ill were sometimes found not to be responsible for their actions. After the trip to the hospital, Griffin saw an account of the hotel killing of Robinson and reported his conversation with Floyd to Detective John Dillmann, (Dillmann), believing that there might be a connection between Floyd and the Robinson killing.
 

 Detective Dillmann and Officer John Reilly located Floyd at a bar called The Louisiana Purchase. They had a drink with Floyd, talked with him for about twenty minutes, asked him to step outside, handcuffed him, walked him a few blocks to the officers’ automobile, and took him to police headquarters where Floyd confessed to both the Hines and Robinson murders.
 

 The Innocence Project of New Orleans discovered fingerprint evidence that had not been previously turned over to the defendant, and had been in the custody of the State for over thirty years. Police files relating to the murder contained a set of latent fingerprints taken from a whiskey bottle and glasses found at the scene of the Hines murder. Although there was speculative testimony regarding whether the print identification might have been inconclusive, the prints are undisputably marked by law enforcement as “Not John Floyd” and “Not victim.” The available evidence also included an affidavit of the victim’s friend, John Clegg who claimed that he told the investigating officer, Detective Dillmann, that Hines had a preference for black men which is consistent with pubic hair found at the Hines’ crime scene.
 

 
 *59
 
 There are few police records in either of these homicide cases because in 1988, 14Petective Dillmann apparently took the original police files of both cases from the New Orleans Police Department in order to write a book about his investigation. John Dillmann,
 
 Blood Warning: The True Story of the New Orleans Slasher,
 
 (1st ed 1989). Dillmann stored the files in the trunk of his car and in his home until the files were destroyed during Hurricane Katrina.
 

 The defense suggests that Floyd has an IQ of 59 (well below the threshold for mental retardation). Dr. Gregory DeClue, a forensic psychologist, who testified at Floyd’s post-conviction hearing, administered the WAIS IV IQ test to Floyd at the Louisiana State Penitentiary in Angola in June 2009, and that test indicated Floyd has a full scale IQ of 59. The generally accepted cut off for mental retardation is 70. According to DeClue, 99% of all adults in the United States score higher on the test than Floyd.
 

 Additionally, DeClue administered the Woodcock Johnson test to Floyd to
 
 assess his language and reading comprehension skills. DeClue testified that, based on the test results, Floyd can read at a second or third grade level. DeClue stressed that these results indicate Floyd cannot communicate at the complex level an average adult can.
 

 DeClue also administered the Gudjons-son Suggestibility Scale to determine Floyd’s levels of suggestibility and compliance. DeClue found that relator displayed a high level of suggestibility, and that Floyd’s “self-reported description was that he’s more compliant than the average person.” DeClue testified that people classified as mentally retarded are 10 times more likely to give a false confession, that in many false confession cases, the confessor included details of the crime scene presumed to be known only by the police and the perpetrator.
 

 Although mental retardation or illiteracy, alone, do not prevent a person from | Joeing able to knowingly and intelligently waive his rights, this Court has held that a mentally retarded 17-year-old with an IQ between 50 and 69 was not able to understand his rights and was incapable of knowingly and intelligently waiving his Miranda rights,
 
 [1]
 
 and thus his confession should have been suppressed.
 
 State v. Anderson,
 
 379 So.2d 735, (La.1980). See also
 
 State v. Raiford,
 
 03-0098 (La.App. 4 Cir. 4/23/03) 846 So.2d 913, where we held a suspect must have the capacity to understand the rights explained before there can be a valid waiver of his rights.
 
 State v. Brown,
 
 414 So.2d 689 (La.1982);
 
 State v. Young,
 
 576 So.2d 1048 (La.App. 1st Cir. 1991);
 
 State v. Tart,
 
 672 So.2d 116 (La. 1996).
 

 BRADY VIOLATION
 

 In my view, the exculpatory value of the fingerprint evidence is sufficient to undermine confidence in the outcome of Floyd’s trial, thus satisfying the requirements for a new trial set forth in
 
 Brady v. Maryland.
 

 [2]
 

 For purposes of
 
 Brady’s
 
 due pro
 
 *60
 
 cess rule, a reviewing court determining materiality must ascertain:
 

 not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.
 

 Kyles v. Whitley,
 
 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995) (citing
 
 Bagley,
 
 473 U.S. at 678, 105 S.Ct. at 3381);
 
 see also State v. Strickland,
 
 94-0025, p. 38 (La.11/1/96), 683 So.2d 218, 234 (quoting
 
 State v. Marshall,
 
 81-3115, Rp. 13-15 (La.9/5/95), 660 So.2d 819, 825 (quoting Kyles)). Therefore, the reviewing court does not put the material to an outcome-determinative test in which it weighs the probabilities that the petitioner would have obtained an acquittal at trial or might do so at a second trial. Instead, a
 
 Brady
 
 violation occurs when, as in this case, the “evidentiary suppression ‘undermines confidence in the outcome of the trial.’ ”
 
 Kyles,
 
 514 U.S. at 434, 115 S.Ct. at 1566 (quoting
 
 Bagley,
 
 473 U.S. at 678, 105 S.Ct. at 3381). The State is charged with knowledge of the collective information in possession of the investigating officers.
 
 Strickler v. Greene,
 
 527 U.S. 263, 280-81, 119 S.Ct. 1937, 1948, 144 L.Ed.2d 286 (1999)(“The
 
 [Brady]
 
 rule encompasses evidence known only to police investigators and not to the prosecutor .... [who] has the duty to learn of any favorable evidence known to the others acting on the government’s behalf in this case, including the police.”)
 

 Considering all of the evidence, including Floyd’s false confession to the murder of Robinson, Floyd’s low IQ and susceptibility to suggestion, the missing police records, the lack of evidence linking Floyd to the murder of Hines, the exculpatory value of the fingerprint evidence, defendant is entitled to a new trial.
 

 [1]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966);
 
 Michigan v. Mosley,
 
 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975);
 
 State v. Loyd,
 
 425 So.2d 710 (La. 1982);
 
 State v. Ned,
 
 326 So.2d 477 (La. 1976).
 

 [2]
 

 . 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In
 
 Brady,
 
 the Supreme Court held that the suppression by the prosecution of evidence favorable to the accused after receiving a request for it violates a defendant’s due process rights where the evidence is material either to guilt or punishment, without regard to the good or bad faith of the prosecution.
 
 Id.,
 
 373 U.S. at 87, 83 S.Ct. at 1196-97. The
 
 Brady
 
 rule encompasses evidence which impeaches the testimony of a witness when the reliability or credibility of that witness may
 
 *60
 
 determine guilt or innocence.
 
 United States v. Bagley,
 
 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985);
 
 Giglio v. United States,
 
 405 U.S. 150, 154, 92 S.Ct. 763, 756, 31 L.Ed.2d 104 (1972);
 
 State v. Knapper,
 
 579 So.2d 956, 959 (La. 1991).